UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THOMAS LOZA,<br><br>            Plaintiff,<br><br>     v.<br><br>INTEL AMERICAS, INC.,<br><br>            Defendant. | No. C 20-06705 WHA<br><br>**ORDER RE MOTION FOR SUMMARY JUDGMENT; REFERRING CASE TO MEDIATION** |

## INTRODUCTION

Plaintiff alleges defendant terminated him because of his age and to prevent him from obtaining benefits under defendant's retirement plan in violation of the Age Discrimination in Employment Act of 1967, California's Fair Employment and Housing Act, and the Employee Retirement Income Security Act of 1974. To the extent stated, the motion is **GRANTED IN PART AND DENIED IN PART**. This case is **REFERRED** to Magistrate Judge Nathanael Cousins for mediation.

## STATEMENT

Defendant Intel Americas, Inc., headquartered in Santa Clara, is a subsidiary of Intel Corporation, the semiconductor developer and manufacturing giant. At all relevant times, defendant has maintained an "employee benefit plan" within the meaning of Section 510 of the Employee Retirement Income Security Act of 1974 ("ERISA"). 29 U.S.C. § 1140. Under the plan's "Rule of 75," employees become eligible for retirement benefits when the

sum of their age and years of employment at Intel equals 75. The retirement benefits include eligibility for defendant's retiree medical plan, a sheltered employee retiree medical account, "which is used to reimburse the cost of medical, dental and vision plan premiums," employer contributions added to their retirement account, stock acceleration, prorated bonuses, and a retirement service award (Dent. Dep. 5:16–6:14).

Plaintiff Thomas Loza was born in 1974 and received his bachelor of science in electrical engineering from Texas Tech University in 1997. He began working for Intel the same year as an electrical engineer and later as a computer design engineer. In 2009, plaintiff held the title "Field Sales Engineer" and was responsible for managing Intel's business with Hewlett Packard. As plaintiff's direct manager in 2009, Chad Constant wrote plaintiff's performance review. To prepare it, Constant took the following steps (Constant Decl. ¶ 6):

> I gathered feedback and data regarding Mr. Loza and his performance in late Q4 . . . and early Q1 . . . . Based on my personal observations, input provided by Mr. Loza, and feedback that I received about Mr. Loza's performance and interactions from employees who worked with Mr. Loza, I assessed Mr. Loza's performance over the calendar year. The assessment of Mr. Loza's performance was then discussed in a calibration session with the broader organizational leadership and management team to ensure alignment, accuracy and consistency. The calibration session also provided an opportunity for others to provide additional feedback and input. Then, I finalized Mr. Loza's annual performance review and provided it to him . . . .

Under the heading, "Key Accomplishments," the review stated (Thronson Decl. Exh. C):

> Revenue – Thomas drove $1.5B of revenue for 2009. Thomas worked through the economic downturn and drove ASP [average selling price], exiting the year at $105. He also discovered and closed a key purchasing hole at HP that resulted in driving his chipset attach rate from ~84% to 100% and ~$75M incremental revenue.
>
> Key Design Wins – Thomas had a very productive year in key design wins. . . .

2

1  Under the heading, "Evaluation: Areas for Development and/or Improvement," the

2  review stated:

> Customer orientation – Thomas' way of interacting with HP is successful with HP's desktop group as they appreciate his direct and candid feedback. Thomas needs to be aware that other personalities at HP could interpret his approach as arrogant or uncaring. Thomas should look into versatile sales person and understand how to alter his approach depending on who he is working with.
>
> \*       \*       \*
>
> Mentoring – Thomas is usually one or two steps ahead of his peers in terms of strategic thinking. . . . Thomas needs to note this and slow down when explaining feedback to his internal team and help them see the strategic picture. Even if a request doesn't make sense, Thomas needs to take the time to explain why.

11  For his performance in 2009, plaintiff received an overall rating of "Successful," one

12  level above the lowest level of "Below Expectations/Improvement Required" on defendant's

13  four-level performance rating convention. Successful covered a broad range of work

14  performance and described employees who generally made solid contributions in their key

15  areas of responsibilities and performed on par with their peers (Thronson Decl. ¶ 12).

16  The next performance review in our record is for 2016, also by Chad Constant

17  (Thronson Decl. Exh. D). In 2016, plaintiff "managed the sales enabling team," a team of six

18  or seven, "with responsibility of driving the worldwide pipeline for Intel Unite and [Intel's]

19  competitive response strategy in the market." Under "Key Accomplishments," the 2016

20  review stated:

> After accessing issues resulting in slow design win scales Tom developed a strategy and pursued key talent to fill what became the Unite sales ranger role in BCP. Through this new role and two initial heads Tom's team was able to influence and increase the Unite pipeline by 20x in roughly 7 months. Tom's insight into how to change our sales motion with end customers and drive a new way of selling has been recognized as a critical path forward for our company.
>
> Tom's [team] successfully drove our key security enabling program around Authenticate. The team was instrumental in developing the early pipeline of customers and influencing them to provide critical feedback to improve our offering. . . .

3

Under "Improvement/Development Areas," the 2016 review stated:

> BCP Influence – The transition to SMG [sales and marketing group] now has provided BCP a sales team for the first time. While this will be a positive for the business, Tom's direct approach combined with a team not used to sales team inputs could create a turbulent situation. It's important Tom, as a senior leader help migrate BCP through this change.

For his performance in 2016, plaintiff again received an overall rating of "Successful," and received a stock share level award of two out of five, one being the greatest, five being the least (*see* Constant Decl. ¶ 18).

In 2017, plaintiff took on a new role and title, "Technical Sales Manager/Director, Enterprise Sales — Growth." He managed a new team of about six or seven with a new responsibility of driving sales of "Unite," a software application that allowed groups to share content and collaborate wirelessly. Some of the individuals under plaintiff's management prior to 2017 transferred with him onto his new team, but some did not. Dave Buchholz, who is seven years older than plaintiff and eventually replaced him, was one who did (Loza Dep. 29:14–15, 30:4–18, 45:24–46:19, 49:11–25; Thronson Decl. ¶¶ 6, 33; Long Decl. ¶ 5; Buchholz Decl. ¶ 4).

Constant continued as plaintiff's direct manager until Caitlin Anderson took over in June 2019. Steve Long became plaintiff's second-line manager in 2017, which meant that Long supervised plaintiff's direct manager and had ultimate responsibility for plaintiff's performance. Long is the same age as plaintiff. Anderson and Constant's ages are not in the record, but at his deposition, plaintiff testified that he suspected that Constant was about his age. During this time period, 2017–2019, plaintiff lived and worked remotely from his home in Texas, Constant lived and worked in Texas, Long lived and worked in Oregon, and Anderson lived and worked in California. At all material times, plaintiff had a professional and good relationship with Constant and a professional relationship with Anderson (Thronson Decl. ¶¶ 7, 8; Constant Decl. ¶ 3; Long Decl. ¶¶ 3, 7, 30; Loza Dep. 164:7, 38:1–9, 55:5–10; Sec. Amd. Compl. ¶ 8; Ans. ¶ 8).

Under "Key Accomplishments," the 2017 performance review stated:

> **2. Lead our People** – Established Ranger role and sales collaboration alignment with key partners including SMG [sales and marketing group], CCG [client computing group], and OEM [original equipment manufacturer] sales teams and set as BKM [best known method] for Commercial CCG [client computing group] BU [business unit] Sales.  Drove customer one-voice consolidation and message to BCP for planning, trail, and execution activities.  Removed roadmap, OEM readiness, support, and customer engagement roadblocks enabling sales efficiencies and customer satisfaction.
>
> **3. Execute with Urgency** – Drove direct customer product expert level engagements with fortune 500 and top 100 schools to ensure product value and position was executed flawlessly while SMG re-organized. . . .

Under "Development & Growth Opportunities," the 2017 review stated:

> **Collaboration:**  As SMG transitions to the new country/BU [business unit] model, Tom will need to ensure collaboration between each of the groups and his team.  Doing this will help Tom remove the "brand" that he is difficult to work with and allow him to take the next step in terms of both grade and position.

For his performance in 2017, plaintiff received an overall rating of "Exceeds Expectations," the second highest rating (and better than "Successful").

In November 2018, plaintiff received a permanent written warning.  The warning stated (Dragen Decl. Exh. A) (errors and omission original):

> In Q3, 2018 multiple complaints were received regarding Tom Loza's behavior in the workplace alleging confrontational and unprofessional behavior.  The Open Door investigation concluded that Tom's behavior violated Intel's Anti-Harassment and Workplace Behavior/Discipline Guidelines.  A few examples of statements Tom made include:
>
> - When discussing a team member via email, "this guys has been a disaster, negative and lacks any credibility… I wouldn't dotted line him into anything that had a pulse" . . . .
>
> - During presentations and staff meetings, Tom's behavior has been described as attacking "pouncing" and offensive . . . . In one situation it was reported that the language and tone Tom used was so offensive that it caused an employee to break down in tears.

The permanent written warning stated that plaintiff was expected to "role model appropriate manager behavior in communications with peers, direct reports and co-workers."

5

Plaintiff appealed pursuant to an internal review process. Jenny Whitty, from defendant's HR department, handled plaintiff's appeal. Whitty interviewed plaintiff, Constant, and "five employees who were involved or related to the complaints," including the HR manager who originally investigated the complaints and issued the permanent written warning. Whitty also reviewed relevant documents. Defendant has submitted a declaration from Whitty stating, "Based on my investigation, I concluded that Mr. Loza's conduct violated Intel's Code of Conduct, Leadership Expectations, and Culture policies" (Whitty Decl. ¶ 7). There is no business record or other non-litigation generated document in the record evidencing defendant's "Leadership Expectations" or "Culture policies." Defendant's Code of Conduct stated (Thronson Decl. ¶ 16, Exh. A) (emphasis added):[1]

> Code Principles
>
> The Code affirms Intel's five principles of conduct:
>
> \* Conduct business with honesty and integrity. Conduct business with uncompromising integrity and professionalism, demonstrating honesty and high ethical standards in all business dealings and treating customers, suppliers, distributors, and others with fairness, honesty and respect.
>
> \*      \*      \*
>
> *Treat each other fairly. Work as a team with respect and trust for each other.*
>
> \*      \*      \*
>
> Conduct Business with Honesty & Integrity
>
> One of our core values is to conduct business with uncompromising integrity and professionalism. We put this value into practice by:
>
> \* *Communicating clearly, respectfully, and professionally in business . . . .*

---

[1] The asterisk "\*" denoted a link in the electronic version of the Code which an employee could have clicked for additional details on that topic.

6

The Code of Conduct further stated: "Each employee is responsible for reading, understanding, and following the Code. Employees who violate the Code are subject to discipline, up to and including termination of employment."

Because Whitty could not substantiate some of plaintiff's alleged misconduct and because some of the conduct appeared to have been addressed by Constant previously, the warning was reduced to a "coaching." Whitty relayed her findings to Long, who approved reducing the permanent warning to a coaching (Whitty Decl. ¶¶ 7, 8; Long Decl. ¶¶ 16, 17).

In early June 2019, Whitty had a videoconference with plaintiff to communicate the disposition of the investigation. Appended to Whitty's declaration, defendant has submitted two emails sent by Whitty purporting to document the findings and conclusions of her investigation. The first is an email Whitty sent to herself purporting to document the list of talking points she made to plaintiff during the videoconference and comments made by plaintiff to Whitty during their conversation. The second email was sent to Deanna Thronson (another HR manager) purporting to summarize the same (Whitty Decl. Exhs. A, B).[2]

Whitty never sent the emails, or any other documentation, to plaintiff. Plaintiff received a copy of the permanent written warning, but did not receive any documentation of the final resolution of the investigation, nor did he receive a "coaching" from Long (Loza Dep. 114:22–115:12, 125:1–12; Whitty Decl. ¶ 8).

In April 2019, while plaintiff's appeal of the permanent written warning remained pending, plaintiff received his 2018 (and final) performance review. Under "Key Accomplishments," the 2018 review stated (Constant Decl. Exh. 2):

---

[2] The Whitty emails are the only documentation in the record of the conversation between Whitty and plaintiff. The emails are hearsay because they are offered to prove the truth of the matters asserted therein; they are not relevant for any non-hearsay purpose. Defendant has not shown that the Whitty emails are admissible under the business records exception to the rule against hearsay—the Whitty declaration states neither that the emails were kept in the course of a regularly conducted business activity, nor that writing the emails was a regular practice of such activity. Fed. R. Evid. 803(6). The Thronson declaration states that the email from Whitty to Thronson "[w]as created and maintained in the ordinary course of business" (Thronson Decl. ¶ 20). *First*, Thronson did not write the email. *Second*, her declaration does not state that making the email was a regular practice of a regularly conducted business activity. *See* Fed. R. Evid. 803(6)(B), (C). Therefore, the Whitty emails are inadmissible hearsay and they are not considered for purposes of this motion.

7

> **Grow the Unite Business** — His team continues to lead cross SMG [sales and marketing group] sales for Intel unite delivering +35% unit and ~4x pipeline growth YoY. With Tom's leadership his team was able to break into new segments and (new to Intel) partnerships with companies like Regus and Haworth. His team continued to set the bar for lead generation programs with continued success from both Unite events and his partnership with GMC [global marketing and communications] . . . . His team is the center of excellence for Unite sales . . . .

Under the "Development Areas" heading, the 2018 review stated:

> **Collaboration —** He is often the smartest person in the room and is able to quickly diagnose an issue or strategy. As a senior leader, Tom needs to bring others with him and help them understand his point of view or what he is seeing. Instead Tom can become frustrated and dismissive and this has led to behavior that is not inclusive. As Intel transforms its culture Tom must adapt.

For 2018, plaintiff's overall performance rating returned to "Successful," and his stock share level award also decreased to level four (Constant Decl. ¶ 16, Exh. 2; Loza Dep. 209:11–12).

In June, after the videoconference with Whitty, plaintiff and his team attended the InfoComm tradeshow. Intel had arranged for plaintiff's Unite team and defendant's "internet of things" sales group, a separate Intel business unit, to present their different products at a shared booth at the tradeshow. Several members of the internet-of-things group submitted complaints about plaintiff's behavior leading up to and during the tradeshow. The thrust of these complaints was that plaintiff did not share the booth with his peers, that plaintiff unilaterally vetoed their presentation ideas, and that plaintiff did not allow representatives from Bluescape, a collaborator/partner of the internet-of-things group, into the booth to do presentations with the internet-of-things team. Bluescape had arranged to have a collaborative product presentation with the internet-of-things team at the tradeshow but, for reasons that are disputed, Bluescape did not show up.

Deanna Thronson, an HR manager four years older than plaintiff, investigated the complaints. She interviewed at least ten witnesses, including plaintiff, several members of the internet-of-things group, and several representatives from Bluescape. Thronson

8

concluded that plaintiff's "my way or the highway approach" had violated the "'One Intel' philosophy" (Thronson Decl. ¶¶ 26, 27).

According to paragraphs ten and eleven of Long's declaration (emphasis original):

> The "One Intel philosophy" stresses teamwork, inclusion, and respect among employees. The core belief underlying the philosophy is the view that Intel is stronger and more successful when employees work together to achieve a common goal.
>
> Under the "One Intel" philosophy, *how* a result is achieved is just as important as achieving the result itself. One can achieve a result but only after having worked crosscurrent with others and burned internal or external relationships along the way. That is *not* the "One Intel" way. . . .

As with the "Leadership Expectations" and "Culture policies," there is no pre-litigation document in our record evidencing the "One Intel philosophy."

Thronson communicated her findings and recommendation of discipline to Long, who decided to terminate plaintiff's employment. By videoconference on September 23, 2019, Long told plaintiff he was fired because he "was acting as non-One Intel," but Long did not go into details. Thronson was also on the call. At the time of his termination, plaintiff was 45 years old and less than four years away from retirement benefits under defendant's Rule of 75 policy (Thronson Decl. ¶ 27; Long Decl. ¶¶ 20, 23; Long Dep. 35:12–16; Loza Dep. 167:24–168:13).

Buchholz was selected to replace plaintiff, first in an "acting capacity" and later as a permanent replacement (Buchholz Dep. 7–10). Plaintiff contends he was terminated because of the cost associated with his seniority, including the impending cost of his retirement benefits (Loza Dep. 172:20–180:25). Plaintiff testified that, while he was in a manager role and assigned to hire new employees at Intel, a member of Intel's finance department told him that Intel was making an effort to cut costs associated with more-experienced employees by replacing them with "lower cost-burden employees" (*id.* at 174:1–175:7).[3]

---

[3] This order assumes, in favor of plaintiff, that the direction from defendant's finance team qualifies as a party admission under Federal Rule of Evidence 803(d)(2)(D).

9

In February 2020, plaintiff dual-filed a charge of discrimination with the Equal Employment Opportunity Commission and the California Department of Fair Employment and Housing, thus satisfying the procedural prerequisites of 42 U.S.C. Section 2000e-5. Plaintiff filed the instant action in September 2020. The operative complaint alleges claims for age discrimination under the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 623, and California's Fair Employment and Housing Act, Cal. Gov't Code § 12940, and a claim for interference with retirement benefits under Section 510 of ERISA, 29 U.S.C. § 1140.

Defendant now moves for summary judgment. This order follows full briefing and an in-person hearing.

**ANALYSIS**

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FRCP 56(a). FRCP 56(c)(1) states:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

At the summary judgment stage, the record is viewed in the light most favorable to the nonmoving party and "all reasonable inferences that may be drawn from the facts placed before the court must be drawn" in favor of the opposing party. *Stegall v. Citadel Broad. Co.*, 350 F.3d 1061, 1065 (9th Cir. 2003) (citations omitted). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). But "bald assertions that genuine issues of material fact exist are insufficient. A factual dispute is genuine only if a reasonable

10

trier of fact could find in favor of the nonmoving party." *Galen v. Cnty of Los Angeles*, 477 F.3d 652, 658 (9th Cir. 2007) (citations omitted).

### 1.     ERISA § 510 — INTERFERENCE WITH PROTECTED RIGHTS.

Section 510 of ERISA prohibits an employer from discharging an employee "for exercising any right to which he is entitled under the provisions of an employee benefit plan . . . ." Pub. L. No. 93-406, § 510 (1974); 29 U.S.C. § 1140.  The three-step burden-shifting analysis established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies to interference-of-rights claims under Section 510 of ERISA.  *Ritter v. Hughes Aircraft Co.*, 58 F.3d 454, 457 (9th Cir. 1995).  The three-step analysis proceeds as follows:

> A plaintiff must first establish a prima facie case of discrimination. If the plaintiff establishes a prima facie case, the burden then shifts to the defendant to articulate a legitimate nondiscriminatory reason for its employment decision.  Then, in order to prevail, the plaintiff must demonstrate that the employer's alleged reason for the adverse employment decision is a pretext for another motive which is discriminatory.

*Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994) (citation omitted).

To establish a *prima facie* case of interference with ERISA rights, an employee must show (1) participation in a statutorily protected activity, (2) an adverse employment action, and (3) a causal relationship between the two.  *Kimbro v. Atlantic Richfield Co.*, 889 F.2d 869, 881 (9th Cir. 1989).  In addition, an employee "must show that employment was terminated because of a specific intent to interfere with ERISA rights . . . ; no action lies where the alleged loss of rights is a mere consequence, as opposed to a motivating factor behind the termination."  *Dytrt v. Mountain States Tel. & Tel. Co.*, 921 F.2d 889, 896 (9th Cir. 1990) (citation omitted).

Here, plaintiff has sufficiently shown a *prima facie* case of interference with ERISA rights.  Plaintiff worked at Intel for 22 years and was terminated just four years before he would have attained benefits under Intel's Rule of 75.  Prior to his termination, plaintiff testified that he was told by someone named Francisco in Intel's finance department that there was a "plan" at Intel to replace more-experienced employees "with lower cost-burden employees" (Loza Dep. 173:17–175:7).  Plaintiff also testified that, when Intel assigned him

11

to hire a new group of employees, Francisco "encouraged" him "to fill out and hire to cost burden profile in the geography that we were allocating up to" (*id.* at 175:2–7). A reasonable factfinder could infer from this evidence, with all inferences taken in his favor, that the impending cost of plaintiff's retirement benefits motivated the discharge. *See Kimbro*, 889 F.2d at 881 (discussing temporal proximity and economic incentives as evidence supporting a Section 510 violation).

Defendant's asserted legitimate business reason for discharging plaintiff was that his "communication and collaboration problems" were irreconcilable with Intel's work "culture" (Opp. 18; Constant Decl. ¶ 12). Given the timing of plaintiff's termination and evidence that Intel was concerned about the cost burden of more-experienced employees, a reasonable factfinder could infer that defendant's vague assertions of plaintiff's incompatibility with Intel's work "culture" were pretextual. Defendant asserts that Long did not know of plaintiff's benefit-eligibility status at the time of plaintiff's termination, but that is a credibility determination for the factfinder. Defendant additionally argues that the record does not support an inference of specific intent to interfere with ERISA rights because the employee who took over plaintiff's role, Buchholz, subsequently had his retirement benefits vest pursuant to the Rule of 75 policy. The record provides no indication, however, that Intel hired another employee to replace Buchholz. The decision to replace plaintiff with Buchholz accordingly does not contradict plaintiff's view that the discharge resulted in net cost savings to Intel (Loza Dep. 180).[4]

Finally, this order rejects defendant's argument that the four-year gap between plaintiff's termination and vesting of ERISA rights is too long to support an inference that the two are related. Tellingly, defendant cites to no binding authority for such a proposition. The decision from the Court of Appeals for the Third Circuit that defendant does cite,

---

[4] At oral argument, plaintiff's counsel added the further point that Buchholz was only selected as plaintiff's permanent replacement a few weeks after defendant received a demand letter indicating that plaintiff planned to file suit. The record contains no reference to the demand letter, however, and this order thus places no weight on plaintiff's argument that Buchholz' selection was designed to shield defendant from liability. *See* FCRP 56(c)(1)(A). At trial, counsel will be free to correct this omission.

1  *Hendricks v. Edgewater Steel Company*, 898 F.2d 385, 389–90 (3d. Cir. 1990), rejected the
2  employee's Section 510 claim where the discharge occurred eleven months before the
3  benefits would have vested. That decision, however, did not involve evidence, as plaintiff
4  has offered here, suggesting that the employer had directed supervisors to cut costs
5  associated with more-experienced employees.
6      Accordingly, defendant's motion for summary judgment on plaintiff's ERISA claim is
7  **DENIED**.

    **2.**    **THE AGE DISCRIMINATION IN EMPLOYMENT ACT CLAIM.**

    The ADEA of 1967 prohibits an employer from discharging an employee "because of such individual's age." 29 U.S.C. § 623(a)(1). Section 623(a)(2), in turn, makes it unlawful for an employer

> to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age.

The three-step burden shifting analysis applicable to claims under Section 510 of ERISA also apply to ADEA claims. *See Ritter*, 58 F.3d at 456.

    The Supreme Court has made clear that mixed-motive age discrimination claims are not permitted under the ADEA. Plaintiffs bringing disparate treatment claims must prove that age was the "but-for" cause of the employer's adverse decision. *See Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175–78 (2009). Moreover, the Supreme Court has held that

> [w]here an employer adopts a pension plan that includes age as a factor, and that employer then treats employees differently based on pension status, a plaintiff, to state a disparate-treatment claim under the ADEA, must adduce sufficient evidence to show that the differential treatment was 'actually motivated' by *age*, not pension status.

*Kentucky Ret. Sys. v. E.E.O.C.*, 554 U.S. 135, 148 (2008). Indeed, the Supreme Court has expressly stated that to "fire an employee in order to prevent his pension benefits from vesting . . . would not, without more, violate the ADEA," even though "[s]uch conduct is

13

actionable under § 510 of ERISA." *See Hazen Paper Co. v. Biggins*, 507 U.S. 604, 612 (1993).

As discussed above, the thrust of plaintiff's claim is that he was a victim of Intel's effort to save costs by replacing more-experienced, higher-cost employees with lower-cost employees (Opp. 1–2, 7). While this conduct may be actionable under Section 510 of ERISA, it does not violate the ADEA absent other evidence suggesting Intel's decision to terminate plaintiff was impermissibly motivated by plaintiff's *age* as opposed to a desire to cut costs. *See Hazen*, 507 U.S. at 612; *Kentucky Ret. Sys.*, 554 U.S. at 148. This is true even though the Intel retirement plan's Rule of 75 policy expressly considers age in its benefits calculation. *See Kentucky Ret. Sys.*, 554 U.S. at 147–48.

Here, nothing in our record shows that a single employee at Intel over the age of forty was terminated, demoted, or replaced with a younger employee. Plaintiff was dismissed by a supervisor the same age as him, replaced by someone seven years older than him and similarly qualified, and never received ageist comments (Loza Dep. 163:14–164:3).

Plaintiff's testimony concerning other Intel employees also fails to support his claim. As an initial matter, this testimony is inadmissible hearsay. Plaintiff admitted that the source of his knowledge was only what he had "heard from [the] rumor mill" (Loza Dep. 186:1–187:13; *see also id.* at 173–176). Moreover, even if this testimony was admissible, it similarly focuses on Intel's effort to save costs as opposed to facts suggesting age discrimination (*see id*. at 173–180). Plaintiff argues that the re-assignment of Chad Constant supports an inference of systemic age discrimination at Intel, but nothing in our record indicates whether Constant's replacement, Caitlin Anderson, was younger than Constant. In short, plaintiff has presented no evidence whatsoever that his discharge was grounded in a "'prohibited stereotype' of older workers" or was "the result of an inaccurate and denigrating generalization about age" of the type proscribed by the ADEA. *Hazen*, 507 U.S. at 612.

14

Accordingly, no reasonable factfinder could infer that plaintiff was discharged under circumstances giving rise to an inference of age discrimination.[5]

Because plaintiff has failed to make a *prima facie* showing of age discrimination, this order need not address plaintiff's argument that defendant's proffered justification for the termination was pretextual. Defendant's motion for summary judgment on the ADEA claim is **GRANTED**.

### 3. AGE DISCRIMINATION UNDER FEHA.

The California Fair Employment and Housing Act makes it "an unlawful employment practice, unless based upon a bona fide occupational qualification," to discharge a person from employment because of the person's age. Cal. Gov't Code § 12940. "Because of the similarity between state and federal employment discrimination laws, California courts look to pertinent federal precedent when applying [California] statutes. In particular, California has adopted the three-stage burden-shifting test established by the United States Supreme Court for trying claims of discrimination, including age discrimination, based on a theory of disparate treatment." *Guz v. Bechtel Nat. Inc.*, 24 Cal. 4th 317, 354 (2000) (citations omitted).

Plaintiff's FEHA claim fails for the same reasons the ADEA claim fails. Defendant's motion for summary judgment on plaintiff's FEHA claim is **GRANTED**.

## CONCLUSION

To the extent stated, defendant's motion for summary judgment is **GRANTED IN PART AND DENIED IN PART**.

This case is **REFERRED** to Magistrate Judge Nathanael Cousins for mediation.

---

[5] Plaintiff also argues that defendant engaged in discovery misconduct by failing to produce Buchholz' personnel records. Defense counsel admitted at the motion hearing that defendant's initial disclosures did not identify Buchholz. Although defendant breached its duty under Rule 26 to identify Buchholz in its initial disclosures, any prejudice was cured by defendant's answers to interrogatories numbers two and six, which identified Buchholz as the individual who replaced plaintiff. Defendant served those responses on August 4, nearly five months before the close of discovery on December 27. In addition, the order dated February 11, 2022, gave plaintiff leave to take Buchholz's deposition and file a sur-reply, both of which counsel did, further curing any prejudice. With respect to plaintiff's document request number 13, defendant's objection that it was overbroad was well taken. Plaintiff has not shown how *all* personnel records of *all* defense witnesses were proportional to the needs of the case. *See* FCRP 26(b).

1  The pretrial conference will be held as scheduled at **2:00 PM ON APRIL 6, 2022**. A bench trial shall commence at **7:30 AM ON APRIL 11, 2022**. Please read the Court's standing order for bench trials.

**IT IS SO ORDERED.**

Dated: March 9, 2022.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE